Good morning. May it please the Court. My name is Drew Legando. I represent the plaintiff appellant Jason Springer. I'd like to reserve three minutes for rebuttal and I'll be sharing time with the Department of Labor today. The Department of Labor is going to address standing. I'm going to address the standard of review and the merits. Quickly moving into the standard of review, district court reviews an ERISA plan administrator's denial of benefits de novo, except in those cases in which the plan language expressly grants discretionary authority to the plan or its administrator to construe the terms of the plan itself. This court really need look no further than its University Hospitals v. Emerson Electric's case and compare the language of the plan in that case to the one in this case. The Emerson Electric's plan gave explicit discretionary authority to the administrator to construe and interpret and create rules for interpretation of the provisions in that plan. There's nothing like that here. The plan here does what virtually every ERISA plan does. It establishes an administrator and it gives that administrator authority to make determinations for benefits using an administrative appeals process. If that were all that were required to create arbitrary and capricious review and not the de novo review that's supposed to be the rule, virtually every ERISA case would be decided under the rule. That's especially acute in this case because the plan operates, like many do, under a structural conflict of interest where it's both the administrator and the one paying the benefits. I'm going to turn now into the merits if there's no questions on the standard. Let me ask you a question about that. As to the merits, I'm wondering why this transaction is even covered under the contract terms since the request for payment comes under these emergency care and emergency transportation provisions. And it doesn't seem to have been, as far as I can figure out, a medical emergency involved at all. The father was getting the to the city where he lives for his convenience, but he wasn't having the child transported to a medical facility for emergency medical care. The baby seemingly was being cared for adequately medically where he was. So I'm just wondering, even though this wasn't discussed in the briefs, I'm just wondering why this transport is at all covered under the policy in the first place. So I think there are two answers. The first is what does the plan language provide for coverage? The plan here provides that 100% of the air ambulance charges will be covered. The requirement is not that it be an emergency transport. That is not what the plan provides. It does not require it to be an emergency transport. It only requires, like many other medical services, that it be medically necessary. And in this case, there is no dispute that this was a medically necessary air ambulance transport. If the child was going to be transported, but there was no requirement for transport, the plan does say emergency and urgent care. But there was no need for any urgent care. The baby was being relocated for the father's convenience. He was being adequately, he wasn't being transported to a medical facility for any emergency or even urgent care, really. And I'm just having trouble seeing where this fits within the contract language. So I think there is a human element here, which is it would be difficult, absent a medical degree, for me to describe how critically ill this child was. It was a team of experts. I think you're missing Judge Clay's point. What he's asking is, we understand and empathize with his situation at the time. What we're trying to figure out is, the way we view emergency or the way I view emergency, let me say, is the reason you are transporting him is to get him to a medical facility for an emergency, like an ambulance. Just think of an ambulance. An ambulance isn't going to pick me up and transport me to another city. They're going to transport me to a medical facility, right, because of an emergent need. Here, the reason he was being transported was because his dad was being transferred. So how does that fit within just the ordinary understanding of emergency? So the plan does not require that the transport be an emergency. Actually, the plan does provide for convenience, that anyone outside of the prison... Isn't that a separate provision? It is, but that's a provision that would provide coverage in this case. So why rely on the emergency provision, then? We have not relied on the emergency provision in any stage of this case. It was not the original claim for coverage. It was not the administrative claim for coverage. It was not in the district court complaint, and it's not in this appeal. Wait a minute. Never relied on emergency. It was the district, in our view, it was the district court's to impose an emergency requirement when the only requirement in the plan is that it was medically necessary. The word used in the plan is required. Was the transport required, which we view as meaning medically necessary, meaning was an air ambulance needed to affect this transfer, or could the transfer have been done using ordinary ground transportation? In our view, there's no dispute that it was medically necessary. The district court read into the word required the requirement that it be an emergency transport, but that's simply not the language of the plan. The transfer wasn't medically necessary. The baby was being adequately medically cared for where he was, and one of the provisions of the decision has to do with whether the period of time after which the claimant is enrolled but before the processing of his application is completed. And as I understand, that's what the facts of this case happen to be. And during that interim period, the father had the baby transported, but there was no need, and then he's saying, well, I could do that because the time could, the papers could be subsequently processed. But under those provisions, those are emergency, that's when there's an emergency away from home, and maybe, as I, my understanding of the contract provisions, and the person becomes ill or injured or whatever, and the application for coverage is in progress but hasn't been completed, and so the person can subsequently ask for the coverage and receive it. But, and all that seems to also contemplate that it be an emergency situation, which is not what this was. And so I'm just having a hard time determining whether there's any coverage at all here. So I don't want to take away time. My time is up. Well, you can respond. So I think there's a lot to unpack there. The first element being, is there coverage at all? There is no dispute in this case, has never been disputed under this case, that if there had been pre-certification, this would have been a covered service. The plan has never disputed that 100% of air ambulance is an applicable coverage in this case. What the defense is, is that there was a failure to obtain pre-certification for what is indisputably a covered service. So I'd encourage the court to examine the plan again if there's some confusion about whether this would be a covered service. It indisputably is a covered service. The denial of benefits was only a result of not having received pre-certification for that service. Your position is that this was not an emergency transport and the district court, by characterizing it as such, was in error. Is that what you're saying here? Correct. The district court rewrote the plan to include a requirement that any transport which did not be obtained because the gentleman was not in the system yet. What is the provision of the contract that you're relying on different from the provisions that the district court relied upon? It's the same provision. The key word is required. The district court understood the word required for transport to mean that it was an emergency transport, such that if there was no pre-certification, I think the district court has an idea. But the district court was, you know, utilizing the provisions that had to do with emergency transport. So if you, I don't know if you would say that the district court was utilizing the incorrect provisions if you're seeking coverage under the same provisions that the district court referred to. I believe that the district court was referring to another provision in the contract that discusses emergency transports in an attempt to analogize that any transport during a period in which pre-certification was unavailable would probably be an emergency too. Because the word emergency had been used to discuss other transports. So is it your position that pre-certification here simply was not required? Because this was not transportation under this emergency transportation provision? I think our position would be a little more subtle, which is pre-certification is required. The plan says that. But there are periods during which pre-certification is impossible. But let me ask you this. So it's required under what provision? The emergency transportation provision or some other? Under all provisions. For air ambulance transport would require pre-certification. Why are we involved with the pre-certification provision? Because since the baby was not in need of emergency medical care, your client could have awaited the, if it took a week or two weeks, the completion of the processing of his application, had his claim approved and moved the child then. But that's not what he did. He took it upon himself to have the child transported at the time he did when there was no immediate need for that. I mean, what I would say is the immediate need was keeping the family together so that the child did not pass away while separated from his father across half the country. Let me just finish. Well, I mean, obviously, I mean, the child is in such dire straits it could be argued he was jeopardizing the child by moving him under those conditions where he had to have all this elaborate medical treatment and a whole team of medical people and run up an almost $400,000 bill just to get him moved and subject him to the air pressure of the air transport and all of that potential jeopardy to the baby. But go ahead. I guess I'm a little bit at a loss. He was being moved to one of the best hospitals in the world. Yeah, but I mean, there was some risk in the logistics of the movement itself, which is why it required an entire medical team and all this elaborate medical treatment. I'm not saying he shouldn't have been moved, but I mean, to say keep the family together, I mean, there were other risks and issues, difficulties to be balanced. Well, so there's nothing in the administrative record which says that the move was inappropriate or that it should not have been undertaken. The question is one of timing where the plan's position is because there was no pre-certification obtained, they shouldn't have to cover it unless it's an emergency situation. And what the plan says is if the move is medically necessary, not emergency, if it's a medically necessary transportation, which this was, no one disputes that the only way to transport the child was by way of air ambulance. No, it was medically necessary if that's the way he was going to be transported, but transporting him itself was not medically necessary. That's not a position that the plan has taken. That's not in the administrative record. The only evidence in the administrative record regarding medical necessity is a letter from a physician which says the transport is medically necessary. So as to that point, that letter from the physician also says that the transfer is not for the convenience of the patient. But I guess your argument is that the transfer at least in part is for the convenience of the parents. I don't know if you really want to use the word convenience, but for the benefit of the family unit or something to that effect. Yeah, I mean, I think there's, obviously we're dealing with plain language on the one hand, it's very cold and sterile. On the other, we're dealing with a very difficult human situation. And in equity, I think those two things do play into each other. Matt, I have two questions. Oh, of course. Just so I understand it. So I think I get everything you're arguing. The back end issue. So I want to just ask you quickly about that. So as I understand it, you would have gotten pre-certification in your argument if he wasn't in this enrollment period where you couldn't. And your argument is, A, it's covered 100%. B, it's covered for non-emergency situations. And C, all we have to do is get pre-certification, but we couldn't. But the plan says we'll handle it on the back end. But on the back end, does that mean during this enrollment period, basically anything you do, like pre-certification to me, and you should explain it to me, pre-certification to me means you've got to go seek permission, and once you get permission, you can do it. This back end argument is a little weird, right? Because it's saying during this enrollment period, you can basically do anything that would be subject to pre-certification, and we'll pay you on the back end. Does that make sense? And can you just answer? That's my confusion. Because I think there's an interorum fear that during this 12-day or 30-day period, we're going to run out and get a full body scan because some doctor said, well, you know, that might be medically necessary. A lot of people would love that. So I think there are maybe two restraints. The first is that it does have to be medically necessary. So you can't go out and get a bunch of elective procedures done during this period. The second is that the charges have to, in the end, be reasonable, and they're going to be adjusted according to the contracts that the plan has entered with various medical providers. And your argument is 10% is not reasonable. Right. So on the usual and customary, I think there's a couple of elements. The first is the – You don't have to, because your time's up, and I understand your argument on the rest of this, I think. You answered my question about the controls, for lack of a better word. My second question is just a real simple one, and I know your cohort's going to address standing, but why didn't you perfect the assignment after – because I think you'll be the one who knows this. Why didn't you perfect the assignment after the first one didn't work? So I won't be the one who knows that. This was all handled prior to any litigation. The assignment, I think it was just between the medical provider and the patient, and they were sophisticated laypeople, so to speak, and it was actually a surprise to us that the district court raised the assignment issue because it had never come up in any of the briefings by any of the parties. And I assume that as to this plan, you're not arguing there's any ambiguity as to any aspect of the plan that is clear. No. Okay. Yes. Thank you. Good morning, Your Honors. May it please the Court. My name is Christine Han, representing the Secretary of Labor, appearing as amicus curiae in this case. I'll be presenting on the issue of standing, that Dr. Springer has constitutional standing under Article III to sue the plan for his claim of denied benefits because his claim confers a personal, concrete stake in this case, which constitutes an injury in fact. I have two points I'd like to make today. First, Dr. Springer's denial of a benefits claim is based on his contractual right to plan benefits, which constitutes a concrete injury. And second, the district court's opinion contradicts So didn't Angel Jet forgo the bill? Is there any indication they've demanded payment? No, Your Honor. There is no indication that they demanded payment. And couldn't they forgo the bill? They could forgo the bill, but regardless of whether a bill exists, Dr. Springer still has constitutional standing, as indicated in the 11th, 9th, and 5th Circuit opinions that state that a bill is not necessary for a plan participant to have standing. But in all those cases, it was different. I mean, each of those is distinguishable on their facts, at least when I read them, which now seems to be forever ago. But correct me if I'm wrong. I thought each of those, there was either an assignment or there was some kind of joint relationship. There were assignments in these cases, but the assignee has standing to assert an ERISA claim because that right is derived from the assignor, because the assignor has an ERISA right, which he assigns to the assignee. So if an assignor does not have constitutional standing in this case, there would be no way to assert an ERISA claim. Can I ask you two other questions? Is there nominal damages available under ERISA or no? Whether or not there are damages for Dr. Springer's ERISA claim is irrelevant to whether he can assert. I understand that. I want to know, are there nominal damages available in ERISA cases to someone who is not owed any money? Like plan breaches. Can they recover nominal damages? I'm just asking a general ERISA question. Even if there are, there could be injunctive risks that are possible? You don't know the answer to my question. In this case, it would not be relevant, Your Honor. Well, isn't that for us to decide? But that question is not relevant to the standing issue, that Dr. Springer, without having determined what his damages could be under ERISA, could still assert an ERISA claim in court. Okay, and is ERISA treated in most instances like a breach of contract? Congress has stated that the purpose, the principal function of ERISA is to protect contractually defined benefits. And this was a contract plan, correct? It was a plan that he had contracted to with the plan because under the plan document, there is a clause that says that 100% of air ambulance services will be covered and Dr. Springer submitted his claim, went through the appeals process, and it was denied, and now he's seeking judicial review. So why are we even looking at standing? Why isn't this just a private right not subject to the standing doctrine? As asserted in his complaint, because he has rights under ERISA Section 50281B to seek judicial review of the plan's denial, as alleged in his complaint, he has standing to assert his ERISA rights for judicial review. Do you know whether Dr. Springer has assigned his claim to anyone? Doctor, it was found in the parallel district court opinion that there was not a valid assignment in this case. And there was no appeal? What do you mean not a valid assignment? Was there an assignment at all? As the record reflects, there was no assignment in this case to Angel Jet. So your answer is no, there was no assignment? As stated in the record, yes. Excuse me? Yes, there was no assignment in this case as reflected in the record. But as the Secretary's opinion, we're not opining on whether there was valid assignment. Well, I didn't actually ask you if it was in the record. I asked you did you know if the claim was assigned at all. And we know it was. Correct? There was an attempt to assign the case, but that case was not appealed after the district court's finding that there was not valid assignment. So as he assigned more in this case, Dr. Springer is asserting his ERISA claims in court. I'm not clear on your answer to tell you the truth. Was the claim assigned or attempted to be assigned or not? It was attempted to be assigned, but the district court found that there was no assignment and there was no appeal of that issue, and therefore whether there was an assignment is not an issue that we have briefed or opined on. Well, yeah, but there was an appeal of the standing issue, and the assignment is pertinent to that. Whether or not there is assignment in this case, Dr. Springer has standing to assert his. Well, maybe not. I mean, you know, that may depend in part on the assignment and what happened with that. But do you know the factual basis or status of the assignment? Or the attempted assignment, if that's what it was? Because the assignee did not have standing, it was found in the district court to not have standing, Dr. Springer is asserting his or his claim because he has standing. Well, I was asking what happened factually in terms of the assignment or the attempted assignment, not your conclusion as to whether you think they're standing or not. Whether... And if you don't know, you can just say you don't know. Outside the scope of the Secretary's opinion, that regardless of whether there was assignment, Dr. Springer... Well, I didn't ask you what your opinion of that was. I was just trying to find out factually what happened in terms of the attempt to make the assignment or failure to do so. But I'm getting from you that you really don't know the answer to that. Is that right? Yes. The record reflected there was no... All right. Okay. Thank you, Counselor. Good morning. Good morning. May it please the Court. Jeff Whittle on behalf of the Appley-Coligna Clinic Foundation Employee Health Plan. It was my intention to be relatively brief because I think that under the merits of this case, it is pretty clear cut. Judge, to your point, there are two components of the transportation provisions. The first is an emergency transport to an emergency room. And I believe the analogy or example that you gave is spot on. But what they're saying is this isn't an emergency. The district court misunderstood. We aren't seeking it under the emergency provision. I agree. The second component of it is, however, is that if a transportation becomes necessary, if you are outside the state or outside the venue of the Cleveland Clinic Foundation, you have to approach the Cleveland Clinic and get preauthorization for that transportation. That kicks into the medical necessity review under the terms of the plan. And there is a medical department under the employee health plan that in evaluating medical necessity looks not only at the medical necessity for transport, but also how a transport is going to be affected under the plan. And they immobilize a team, literally, to address how this is going to be accomplished and accomplished through its tier one providers, which include air transportation as well as other forms of transportation. So the preauthorization requirement really kicks into the medical necessity component and how the medical department of the health care plan does and effectuates the transfer. So you go in, you ask them for the transportation, and to Judge Clay's points earlier, there was no medical need for transportation at this time. The child was stable. Everything was fine. And they could have gone through all of the processes and worked with the Cleveland Clinic's employee health plan and their medical department to effectuate a transfer if it was medically necessary in their view. So your position is that this was not an emergency transport. You do agree with your opponent as to that. Oh, absolutely. And so there was no reason that there was not time to go through the precertification because there was no imminent or medical necessity for the transfer during that short time frame when the application or the disclaim would have been pending for approval. Absolutely correct. And if you look actually at the medical necessity provisions of the plan, they tell you to call them, call the medical department. They provide a number in the plan that you can work with the medical department to try and accomplish this. Let me ask you this. Sure. Dr. Springer, did he consult with your client at all about his decision to move the child and how he could arrange to have his claim paid before he made and implemented his decision to move the child? There is no evidence in the record that aside from signing the benefit enrollment forms that Dr. Springer had any involvement with the plan or attempts to make effectuation of the transfer or transportation under the plan. So he didn't even attempt to obtain the coverage or request it until after the child was moved. Is that right? That is correct. It's a little bit different, and I think this is going to answer a question that you raised, Judge Clay, earlier about the assignment. There was an assignment made in this case by the Springers to Angel Jet. It's part of the administrative record in this case. Angel Jet really kind of took over everything as this progressed administratively through the process, and there's no evidence of any involvement by the Springers whatsoever. Now, had there been a true medical emergency, he could have moved the child for that reason without seeking prior approval, but that's not the situation we have here. That's correct. That's correct. So to answer your question, there was an assignment. What happened was Angel Jet instituted the first action based upon that assignment, made representations throughout the administrative proceedings that they were the agent of the Springers based upon the assignment. When it got to the district court, the district court found that as applied to the Cleveland Clinic's plan, the Springers did not assign any rights to that plan. The district court did not make any determination of what the relative rights were between the Springers as Asinores and Angel Jet as Assinees. Well, let me ask you this. Had Dr. Springer sought prior approval, would this claim have been covered under the plan? I think the plan answered that in the letter that they wrote as the final step of the appeal process, and it was the health care plan advisory letter. And what they told Angel Jet at the time, and Springers by virtue of Angel Jet, is, look, had you followed the plan procedures and done what you were supposed to do under the plan, in other words, get preauthorization through the medical department of the health plan? You agree you couldn't get preauthorization during the enrollment period. Well, there's upwards of a 15-day gap that occurs when you sign in and before you become part of the system. If you look at the plan actually... Right, and it also says they'll pay on the back end. Well, no. What it says is they'll look to, you know, your claim may be, the actual language is the claim may be denied, but we'll look and make adjustments as necessary on the back end. Before you go off on that, could you finish answering my question? I'm sorry. About whether the claim would have been approved or not on the merits of the claim. To finish what the health plan advisory committee told Angel Jet at the time was, look, if you had followed all of the steps and all of the procedures that the plan requires to get preauthorization and approval by the medical department, Angel Jet would not have done the transportation anyways because Cleveland Clinic Foundation has a tier one provider that they have an arrangement with that does air transportation when it is approved by the plan. And that amount would have been roughly the amount that actually got paid to Angel Jet, the $34,000 as opposed to the $340,000. What the plan did is, while they felt there was no obligation for lack of preauthorization to make any payment whatsoever, in an effort to try and be fair to its plan participants and its employees, it looked at its history of air transportation and how this relatively compared to it. And the highest they had ever paid, and I believe if I remember correctly, it was a flight from Abu Dhabi to Cleveland, was roughly half the price of what they were being charged for a flight from Utah. So Angel Jet inquired of the plan as to whether Dr. Springer was covered, Dr. Springer and his family, and at that point the plan said, we really can't tell you right now because it's in process, and it's going to take this 15-day period to expire, something like that. Am I right about that? What the administrative record reflects is, the enrollment forms are signed on July 1st. Telephone calls are made to determine whether or not he was eligible under the plan. And there's a further record in there where they interviewed the actual customer service representative who took the call, and that person indicated there was never any discussion about requests for pre-authorization or that. It was just, is he an eligible participant in the plan? And the inquiry ends there. And do we know then who authorized the actual transport? Did Angel Jet at that point just accept that they were going to make the transport, or do we know whether Dr. Springer? If you look at Exhibit 27 in the administrative record, there is a record of a telephone conversation between the Cleveland Clinic Health Care Plan and the representative of Angel Jet where they asked Angel Jet point blank, who authorized this? And the answer given by Angel Jet in the record is the parents. Looking at the standard of review, if you look at the district court's opinion, the district court looked at this both under the arbitrary and capricious standard of review as well as the de novo standard of review, and said under either standard, I'm coming to the same conclusion here based upon the clear language of the plan. Can I go back just a question? Absolutely. Did the district court, so one of their complaints is the district court analyzed the wrong section of the plan in making this determination. I disagree wholeheartedly. The district court looked at the pre-authorization component of the plan and said, there is absolutely zero evidence in this record that suggests pre-authorization was ever sought. There is a specific exclusion for any type of medical care that requires pre-authorization and does not get it. But their complaint is, look, he was in the enrollment period, so they couldn't get pre-authorization, so everything relies on the back end provision. Well, if you actually look at the plan, there is a provision in the plan that specifically allows the plan to go back retroactively and make adjustments to claims being made and specifically advises plan participants that they may have financial responsibility as a result of this kind of look back. But I think candidly, if you look at the overall and overarching intent of the plan, is if there is kind of medical procedures that have been ongoing or things like that, they're probably not going to quabble or squibble over those in the 15-day period. If you have something that is really not necessary and can certainly wait until you are properly made a part of the plan and through the documentation, that would have allowed the pre-certification process to proceed. And I think the point of the district court was there was no evidence that a delay or waiting implicated care or treatment in any respect, that everything was stable, the move did not need to happen at that time, and they had every opportunity after that to seek pre-authorization. So they jumped the gun on it. And I believe the court characterized it aptly is at times it's easier to seek forgiveness rather than permission, which is precisely what happened in this case. Let me address standing very briefly, and again, Judge, I think to your point where you saw some distinguishing features from a number of the other cases that were relied on. I think one of the telling examples, if you look at the Spindex case, in Spindex when they made the assignment, there's a specific acknowledgment by the plan participants that they remain on the hook for the entirety of the medical bill. So they have skin in the game. Unlike those cases, there's no skin in the game here. There is no evidence in the record that Dr. Springer owes a nickel regarding the coverage. Nothing. Is there evidence that he will never owe a nickel? The only reference that the district court made in analyzing it was an excerpt from the reply brief that was filed below that was suggestive that they would not be seeking reimbursement from the Springers on the basis of the assignment made. Again, Judge Clay, back to your point, the court didn't determine the relative rights and responsibilities for that assignment between those parties and what that required. But there is no evidence in this case that Dr. Springer owes a nickel, and that's why we raise the issue of whether there is genuinely an injury in fact. Let me ask you a different question. Do you agree that a risk should be treated like a contract? Isn't that what the courts traditionally do? Historically, it really emanates from the law of trust, which has a contractual component to it. But it's a private right, not a public right. In other words, you agree with that? I do agree with that. Okay, so why does Spokio apply that? Spokio involved a public right. Well, my understanding of Spokio as I read it is it looked at a statutorily conferred right, which is a public right. Yes and no. I mean, I think that we have a statutorily conferred right here, because I really don't... Well, why? Because here there's a plan that's a contract, and so the breach of that contract is what they're really suing under, and ERISA is just an enforcement mechanism. I don't totally agree with that. Okay, explain why. I think that ERISA goes beyond merely an enforcement mechanism. I think ERISA provides a statutory framework for plan participants, fiduciaries, et cetera, to be held accountable on one hand, as well as to pursue what the legislature has deemed its rights. Why I hesitate on it being a purely contractually type remedy is the preemptive effect of ERISA. I mean, if you try to make a contract claim, it's going to revert back to ERISA. But does that change the nature of the right just because Congress preempts it? I mean, Congress is not conferring a right here. The plan is, and the plan is a contract. Does that make sense? It does. But I think ERISA goes a little bit further than saying we're just going to be an enforcement mechanism for contract rights. I think it is a comprehensive scheme to assess relative rights, responsibilities, and liabilities within the context of a statutory scheme. I mean, it goes a lot broader than one iota. You're going to know better than me, but I guess there's no cases out there that say it's a public or a private right, right? I'm not aware of any, Your Honor. And I believe the answer to your earlier question about nominal damages, I do not think they are available. They're very specific. I'm happy to answer any further questions the panel may have. Thank you very much. Thank you. Mr. Lugando? I'm seeing three minutes there. I know I took a lot in the first, so feel free to tell me to sit down. As for Dr. Springer, there seems to be a lot of concern about what did Dr. Springer do or try to do or not do, and what did Angel do or not do. To me, this is pretty simple. Dr. Springer was having his son admitted to the Cleveland Clinic. There was a lot of preparation that went into that. The idea that this was a surprise transport, and the baby shows up and is moved into a room, there was a lot of planning that went into this. The specific item of the air ambulance transportation. Why not just use their air ambulance? The Cleveland Clinic. Like you said, they're the best medical facility in the world. They're not going to run a Tier 4 air ambulance. Why not use theirs? I'm a little hesitant to answer because I don't think there's anything in the administrative record. But my understanding is that Dr. Springer had researched air ambulances. He is a physician. This was the company that he had been working with for, I think, about a month, prior to the transport being effected. Part of it may simply have been that he was not aware that the clinic offered the in-house at a lesser cost. I don't know that. So that was done on two occasions in which Angel calls. My doctor would do that. I think your doctors would do that. We're not typically the ones asking our insurer, is X, Y, or Z covered? In the first instance, a claim form is sent. So-and-so should have an MRI. Is this going to be covered? So I don't think there's anything unusual about Angel having been the one that inquired. If you were a new enrollee and you're waiting for your application to be processed, certainly under those circumstances you're going to incur an expense of this magnitude. It stands to reason you check on your coverage. Right. So that was done on two occasions in which Angel calls to try to confirm coverage. The next step after confirming coverage- I don't mean Angel. I mean your client. I mean Angel, I guess, is his agent. I don't know what understanding the two of them had. But your client, you would think, would want to confirm coverage for himself. So I don't think there would have been any difference if Angel had made the call or Dr. Springer made the call. They both pick up the phone. They call into the plans hotline. But your opponent said that nobody checked with them. No, they did on two occasions. That's clear in the record. And they asked whether Dr. Springer was enrolled. And the answer was, we can't tell you that yet. He's just started. He's in this paperwork processing period. Right, but that's why it makes sense for him to call because it seems like what I'd do if I need a doctor and I want to find out if my insurance company covers them, I look in the book. I call them. Had he called, they would say, look, we've got this air ambulance service. They're great. They're one of the best in the world. We'll handle it. I'm not sure that that's what would have happened. I think if you call into Ann Terry's, the third-party administrator, whoever asks is so-and-so enrolled, whether it's the agent medical provider who does it or the insurer themselves. They say, well, we can't tell you that. Well, can you pre-certify an air ambulance transport for me or can you give me recommendations on another? No, I can't tell you that. You're not enrolled in the plan yet. That's why it's impossible. You can't get through the door to start asking those questions or having those negotiations. They can probably tell you who a preferred provider is. I mean, most beneficiaries of insurance or plans know that, you know, there's a preferred, in many plans, a preferred provider that has agreed to provide the service at a specific price. Yeah, I think that's true. Going back to the earlier concern about controls, I think most insurers know that if they use an out-of-network provider, there is some risk that a portion of that may not be covered. And that's just subject to the coverage provisions of the plan. In this case, it's $300,000. That's right. But I would just say those are the usual and customary charges under the Arizona regulatory authority that's over ANGEL. And there's no evidence in the record that those charges were beyond what the marketplace for air ambulance. The only indication is that the steep discounts that the clinic receives from its own owned company would have been different. If I can just say one more thing on standard. Very quickly. Okay. If we were to affirm the district court's decision on standing, I think we would be inviting a real practical problem, which is that medical providers would have to pursue, either through collections or enforcement actions, all of their insurers before the insurer gets standing to pursue plan benefits. Not if they perfect an assignment. Well, I mean, that might create another problem, which is now we're asking everyone to assign their claims to medical providers to now be the enforcing plaintiffs in all aristic cases. They're not going to enforce the money against you when they want their money. That's how it works. And it worked in the 5th, 9th, and 11th circuit, as your cohort pointed out. Yeah, and I would think there are a lot of cases in which those assignments are not going to occur. And so we're going to leave tens of thousands of insured employees really with no recourse. Do you have any cases for the proposition this is a private right? I don't, but I think I do agree that because it's based in contract and ERISA simply establishes what that contract must include, what its minimum provisions are, what disclosures have to be made, and then what administrative remedies must be exhausted prior to pursuing that contractual right, that it is a private right to the individual. Okay. Thank you. Thank you, counsel, all three of you for your arguments today. We very much appreciate your appearance and arguments. The case will be submitted, and you may call the next case.